United States XRL Blair Hamrick v. Glaxosmithkline, LLC Matt Fogelman, PLC Thomas Williamson, GlaxoSmithKline I think it was Mr. Reedy, the director of HR, who in a deposition said that if the employee had somehow come up with a satisfactory explanation of why he had done or said these threats, there might be a path back. That's not to say, to us that is not probative of any indication that the company was not taking seriously the dangerousness of this threat. Is there any evidence as to what the conditions were that Reedy had in mind? And whether those conditions came true? Your Honor, the company is saying we're willing to give you an interview to listen to your side of the story. And when you put his remark in that context, I think they're saying we have grave concerns here. That's why we want to talk to you. That's why we want to have this interview. But we're not determining the result. We want to hear what you have to say. Then we will make our decision. Again, we think that's simply an indication that the company was trying to make its process for investigation as fair as possible, but in no way an indication that the company was not actually concerned about the danger that Mr. Hamrick's threats posed to other employees. And, of course, throughout this time, he was maintained on administrative leave with pay, but the company was not taking any chances on having him around until they finished their process. So the so-called inconsistency, we think, is really illusory. The company took decisive, appropriate action immediately after doing an investigation right away about these complaints while that conference was still going on in Dallas and then informing Mr. Hamrick that he would be put on administrative leave. But this wasn't a simple or just your regular, you know, potentially homicidal employee. This was your potentially homicidal employee who was also making allegations about improper marketing practices. And the company had a responsibility to try to understand what those allegations were and follow its policy of getting employees to talk about that so they can do their own investigation of whether management needs to take corrective action. So this additional time, there were a couple of pieces that went into why it took a number of months before the final action was taken. One was the effort to negotiate a severance agreement, which we think is just perfectly conventional. If you have a difficult employee, somebody you'd rather not have around, it's preferable if you're willing to pay some severance to negotiate a severance agreement, try to get an appropriate release, and that's all behind you and you aren't looking ahead at future expense of litigation. That process went on for a couple of months. It broke down or it wasn't successful. And the company said, okay, we're going to move ahead now and do what needs to be investigated. As the record shows, there was some kind of gamesmanship with counsel at the time for Mr. Hamrick that frustrated that. And then eventually the company said, look, this doesn't look like you're really interested in cooperating. We feel we have enough evidence based on the investigation that we've already done, and we believe the appropriate thing to do is to terminate you and make sure you are not a threat to our other employees. For all those reasons, we think there are more than adequate grounds, Your Honors, for affirming the grant of summary judgment by the district court. Thank you, counsel. Thank you, Your Honors. I'd like to make two brief points if I could in my remaining time. If the statements were so bad, then they should have gotten rid of him right away. It's as simple as that. Well, but then that's an odd policy to set off here. It's kind of a good thing that they got him out of the workplace, but they continued to pay him. They gave him a benefit of a doubt. There's probably some exposure for potential mental disability, discrimination of some type. They've got to think through. He may be a relator. So they give him the benefit of we'll keep pay, but we'll protect our employees. And if we now hold that when you do that, that gives rise to an inference. We're essentially telling employers, fire him right away. How's that a good thing to do? Your Honor, if somebody does something so egregious, again, the example that you gave, absolutely fire them right away. Well, no, you get him out of the workplace right away. But maybe this is something you don't know about the facts. Maybe they had a psychotic episode triggered by some exposure to some environmental hazard that can be cleared up. You don't know for sure, so you've given them the benefit of doubt. It seems to me we would want to encourage employers to treat employees that way and not set this rule that says unless you fire him right away, you're going to be looking at a lawsuit. I understand that, Your Honor. But in the context of the other things that were happening in this case, that's where I think that that policy argument falls apart. I do understand what you're saying, absolutely, Judge. A couple of other points. The fact that he's a whistleblower encourages them not to give him due process and to fire him? Your Honor, here's the thing. That's a socially adverse policy. Your Honor, please, I need to absolutely respond to that. In the papers, please read the GSK's briefs. GSK says that in the February, March, April, after Dallas timeframe, they did not suspect he was a relator. That is a crucial point. We believe that GSK suspected he was a relator. GSK has taken the position that they did not suspect he was a relator. If that's true, Your Honor, then it is disingenuous. They couldn't have taken the fact that he was a relator into consideration. Let's give them the benefit of the doubt and put them on administrative leave because they've said that they did not suspect that. No, they gave him the normal process that happens. Almost every employer in this country is very wary about being sued by an employee that they terminate. I don't see how this so-called factual dispute has anything to do with your claim here. That is what employers do. They give due process to their employees. In my experience, Your Honor, if there's something that's supposedly egregious, the employer fires the employee. That is what I see in my practice, at least. Maybe there's other cases. The other policy, if I may have 20 seconds. There's a policy concern that's kind of the flip side of what Judge Kayana asked me. GSK knew that Mr. Hamrick was in a volatile situation. That is a fact. They were aware of that. Instead of transferring him to Florida, as he requested, instead of investigating his claims of retaliation, instead of investigating a claim that Mr. Hamrick's son was being harassed, they didn't do anything. They left him in the pressure cooker. But he wasn't. He wasn't there. No, no, no, Your Honor. Prior to Dallas, when he came back from medical committee, he was in a pressure cooker situation. Fact. GSK had concerns that he wasn't ready to return to work. That's a fact. They wanted him to take a fitness for duty exam. Legal comes in because they suspected he was a relator, even though they don't admit it. Legal comes in, shrouded in privilege, and says, no, leave him where he is. Send him to Dallas in this volatile situation. And, yes, something did occur. But it was they had a feeling that something might occur. They wanted him to quit. You've taken your time. That's the policy argument, Your Honor, that we encourage employers to leave people in these situations until something happens. Thank you so much.